## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:17-cv-61-GCM
## (3:12-cr-239-GCM-DCK-24)

| | |
|---|---|
| **DENETRIA MYLES,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **ORDER** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or

Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1). [1]

### I.    BACKGROUND[2]

Petitioner was charged along with 25 co-defendants in a seven-count superseding

indictment which included allegations related to investment and securities violations, bank and

mortgage fraud, wire fraud, and distribution of controlled substances. The charges against

Petitioner were: Count (1), racketeering conspiracy in violation of 18 U.S.C. § 1962(c), (d); and

Count (3), mortgage fraud and aiding and abetting the same in violation of 18 U.S.C. §§ 1344

and 2. (3:12-cr-239, Doc. No. 158).

---

[1] Petitioner previously filed two § 2255 petitioner that were dismissed without prejudice as premature. <u>See</u> <u>Myles v. United States</u>, 2015 WL 12911750 (W.D.N.C. May 21, 2015) (3:15-cv-113); <u>Myles v. United States</u>, 3:14-cv-713 (W.D.N.C. Jan. 7, 2015).

[2] Evidence relating primarily to co-defendant Wolf has been omitted from this section for the sake of brevity.

The Government's theory of the case was that Petitioner and other members of the enterprise, including real estate agent Nathan Wolf with whom Petitioner was jointly tried, engaged in a mortgage fraud scheme including multiple acts of bank fraud, wire fraud, and money laundering that defrauded lenders of approximately $48 million. Myles served the enterprise as a promotor, or organizer, for its mortgage fraud activities. She was also a buyer of property including 1044 Antioch Woods Dr., and served as the enterprise's notary public by notarizing fraudulent documents for fraudulent deals organized by other promoters. The Government theorized that Wolf and Petitioner based their fraud on five lies: price, kickbacks, down payments, appraisals and loan applications, and false notarizations. Petitioner's defense was based on the Government's lack of evidence and Government witnesses' lack of credibility because they either faced substantial sentences themselves or were not being prosecuted by the Government.

Debra Williams Sherrill, a personal finance instructor at Piedmont Community College testified as an expert in mortgage banking. (3:12-cr-239, Doc. No. 571 at 34). She explained the mortgage loan process including the sales price, terms and conditions, down payment, appraisal and underwriting requirements. (3:12-cr-239, Doc. No. 571 at 39-43). Information including the appraisal amount, down payment, realtor fees, and employment history allow the bank to determine the amount of risk involved in the loan. (3:12-cr-239, Doc. No. 571 at 45-47). Whether the information in the loan documents is truthful "absolutely" matters because "[e]verything that the borrower signs is stating that everything on the document is 100 percent correct and the lender relies on that information in order to make a valid underwriting decision." (3:12-cr-239, Doc. No. 571 at 49). Certain loan documents are typically notarized to confirm the person who is signing it is verifying that what they are signing is accurate. If a document is not

correctly notarized, "then who knows who is signing it and who knows whether or not that information is correct." (3:12-cr-239, Doc. No. 571 at 49). A federal HUD-1 settlement statement is required by federal law to "list every single fee connected to this transaction on the buyer and the seller's end" pursuant to federal law. (3:12-cr-239, Doc. No. 571 at 50).

Timothy Mathers, an IRS witness coordinator, certified Petitioner's tax returns and for 2005 through 2008. Petitioner's 2006 return reports $35,475 income as a real estate agent. (3:12-cr-239, Doc. No. 572 at 130). Her company, Abele Unlimited, is listed as a cargo transporter with a profit of $68,644; it does not say anything about real estate development. (3:12-cr-239, Doc. No. 572 at 130). A residential loan application that Petitioner signed on May 19, 2006, names Petitioner as the borrower with employment for the past three years with AKKO Ventures. (3:12-cr-239, Doc. No. 572 at 131). However, Petitioner's tax documents do not show any income from AKKO ventures in 2006. (3:12-cr-239, Doc. No. 572 at 132).

Ozie Stallworth testified as an expert on North Carolina notary publics and their duties. (3:12-cr-239, Doc. No. 573 at 34). He described the requirements for different types of notarizations as well as fraudulent notarization and notary misconduct. (3:12-cr-239, Doc. No. 573 at 49). He testified that a notary should refuse if a person is not before the notary because personal appearance is required. (3:12-cr-239, Doc. No. 573 at 50-51). Petitioner cross-examined Stallworth about whether he has ever seen someone take a notary document and modify it using fraud (3:12-cr-239, Doc. No. 573 at 58), how easily a notary stamp can be obtained (3:12-cr-239, Doc. No. 573 at 61), whether someone could present false identification before a notary (id.), whether he had brought a copy of Petitioner's signature to compare and see if it was forged or not (3:12-cr-239, Doc. No. 573 at 62-63), and whether notarial certificate can be detached and placed with another document, (3:12-cr-239, Doc. No. 573 at 69).

Mark Wittig testified that he was a home builder who used Wolf as realtor to sell his homes. He testified that he conspired with "Nathan Wolf, Denetria Myles, and others" in bank fraud. (3:12-cr-239, Doc. No. 572 at 6). Wittig would build a house and set a price, then Wolf would list the house at an inflated price which and the difference would go back to the buyer as a kickback. A "compensation agreement" that Wolf provided included the actual price of the house, the "gross price," and what the inflated price was for the loan amount that was submitted to the bank, the "strike price." (3:12-cr-239, Doc. No. 572 at 11). The inflated price was justified by adding expenses that were described as construction design service that was actually a kickback; nobody did secondary work on the homes. (3:12-cr-239, Doc. No. 572 at 13, 22-23). Wittig accepted the lower "gross price" for the properties because they were guaranteed sales. (3:12-cr-239, Doc. No. 572 at 18-19).

The Government introduced a compensation agreement with Petitioner as the buyer of 1044 Antioch Woods Dr. Wittig testified that Petitioner and Wolf did not get along because Wolf did not get money he was supposed to on a deal, that Petitioner was trying to get around him. (3:12-cr-239, Doc. No. 572 at 30). However, they reconciled close on this deal. Petitioner was named as the buyer in the compensation agreement and there is a gross price and a strike price like Wolf's other compensation agreements. (3:12-cr-239, Doc. No. 572 at 1). The agreement says Jimario Dyson, someone Petitioner knew, did work on 1044 Antioch Woods Dr. and got a finder's fee for finding property for her. (3:12-cr-239, Doc. No. 572 at 31). The agreement also lists "New Vision" as doing design work, etc. However, New Vision is actually Petitioner, and did not render any services on the house. (3:12-cr-239, Doc. No. 572 at 32). The HUD-1 settlement statement for 1044 Antioch Woods Dr. says $3,452.72 was going to Myles, but she was really getting over $70,000. (3:12-cr-239, Doc. No. 572 at 33). Petitioner was at the closing

and signed the document. Wolf signed Wittig's wife's name because she was not at the closing. (3:12-cr-239, Doc. No. 572 at 34). On cross-examination, Wittig testified that Petitioner moved into the home briefly but lost it to foreclosure. (3:12-cr-239, Doc. No. 572 at 38).

Sean Williams testified that he met Petitioner in 2003 through her child's father, Akeem Mustapha, and Mustapha's company AKKO Ventures. Williams did accounting books AKKO Ventures and also did Petitioner's tax returns in 2003 and 2004. (3:12-cr-239, Doc. No. 572 at 96). Petitioner's W-2s for 2003 and 2004 say that she was a loan officer. (3:12-cr-239, Doc. No. 572 at 96). He filled out Petitioner's 2004 tax return with information that he received from Petitioner, reflecting that her total wages and income that years was $29,062. (3:12-cr-239, Doc. No. 572 at 99). Petitioner signed the tax return that it was true and accurate. Williams recognized Petitioner's signature on the loan application for 1044 Antioch Woods Dr. (3:12-cr-239, Doc. No. 572 at 100). On the loan application Petitioner signed on May 19, 2006, Petitioner states her employment history is as finance manager of AKKO Ventures for five years with income of $14,000 per month, which is false. (3:12-cr-239, Doc. No. 572 at 102-03).

In 2004, Petitioner asked Williams if he knew anyone interested in buying some homes, and whether he would be interested in helping sell some of these homes. She brought him a list of different properties that were for sale at the time and, at the bottom, it said "15 percent kickback to the … buyer." (3:12-cr-239, Doc. No. 572 at 105). The Government clarified:

> Q. So Ms. Myles explained to you that if you found buyers, that Terra would offer a 15 percent kickback minus closing costs.
>
> A. Correct.
>
> Q. And what would you get out of it or what would she get out of it?
>
> A. Well, basically, she told me at that given time if you would help me out, between myself, her and the buyer, basically the buyer would get, I guess, half of

– half of what the difference was and she and I would split – pretty much I would get a third of whatever she had.

Q. So half the kickback would go to the buyer, the other half would go to Ms. Myles and she would give you a third of her half.

A. Correct.

Q. Did she use the word kickback?

A. Yes.

(3:12-cr-239, Doc. No. 572 at 105-06)

Williams knew it was illegal but became involved in two deals with Petitioner because he wanted extra money. Williams asked Petitioner how it operated so she introduced him to Mike Foley. Williams then went around Petitioner and did deals directly with the builder so he would not have to split the kickback with her anymore. (3:12-cr-239, Doc. No. 572 at 107). He did more deals after that and pled guilty to mortgage fraud and money laundering. (3:12-cr-239, Doc. No. 572 at 108). He was testifying to tell the truth and in hopes of getting leniency in his criminal cases. (3:12-cr-239, Doc. No. 572 at 108).

Ralph Johnson testified that he knows Petitioner through acquaintances. (3:12-cr-239, Doc. No. 572 at 242). He is incarcerated for lying in real estate transactions, which he committed with William Brown and Nathan Wolf. (3:12-cr-239, Doc. No. 572 at 242). Money would come to him and his company as design fees although he not a designer via a compensation agreement with Wolf, which was the only way the lender would sign off on the loans. (3:12-cr-239, Doc. No. 572 at 243). In one transaction, he exchanged emails with someone who he thought was Damali Neal, who said she was interested in purchasing property. (3:12-cr-239, Doc. No. 572 at 246). That person provided all her pertinent information, including her driver's license number and social security number, over emails, and got compensated once the deal closed. (3:12-cr-239,

Doc. No. 572 at 247). He admitted that Neal did not come to the closing so Johnson forged her signature on false HUD documents. (3:12-cr-239, Doc. No. 572 at 250). The closing documents for the townhouse purchased by Neal says "Sworn and subscribed to before me this 15th day of August … 2007." (3:12-cr-239, Doc. No. 572 at 250). The "notary public" signature says "Dee Myles" meaning Petitioner. (Id.). Neal was not present before Petitioner on August 15, 2007. Johnson considered Petitioner a friend and took the documents for her to sign. (3:12-cr-239, Doc. No. 572 at 251). There was more than one document like this, and Neal was not there for any of them. (3:12-cr-239, Doc. No. 572 at 251-52).

Johnson bought between five and eight houses with various investors and Wolf, who told him not to let the properties foreclose because that would put the "heat" on them, meaning law enforcement scrutiny. (3:12-cr-239, Doc. No. 572 at 253). One of the other home sales was to Johnson's mother, Elsia Milligan. Johnson took the closing documents to Petitioner. Johnson signed them and Petitioner notarized them without having Milligan appear before her. (3:12-cr-239, Doc. No. 572 at 261-62). On cross-examination, Johnson admitted that Petitioner notarized the documents because she trusted Petitioner. She did not get paid to sign them and was not doing it for the conspiracy to go forward. Cross (3:12-cr-239, Doc. No. 572 at 263).

Damali Neal testified that she had never been to Charlotte before, did not make the loan at issue, did not sign the documents, and did not appear before Petitioner on August 15, 2007. (3:12-cr-239, Doc. No. 573 at 16). Nor did she sign a second loan that Petitioner notarized on January 25, 2007. (3:12-cr-239, Doc. No. 573 at 20-22). On cross-examination, Neal admitted that she was not present so she does not know who notarized the documents. (3:12-cr-239, Doc. No. 573 at 26).

Gina Ford testified that she had been Petitioner's best friend for more than 20 years. (3:12-cr-239, Doc. No. 573 at 153). Ford allowed Petitioner to use her credit to get trailers for Petitioner's trucking company, Abele Unlimited. When Petitioner needed help getting a property, Ford bought a property for Petitioner as borrower. Ford applied for a loan with SunTrust and is still paying the mortgage, which is current. Ford did not realize until the end of the transaction that the seller was Petitioner's husband, Akeem Mustapha. (3:12-cr-239, Doc. No. 573 at 158). Ford did not know that Mustapha had bought the property a few months earlier for less than half of what Ford paid. (3:12-cr-239, Doc. No. 573 at 158). Contrary to the closing documents, Ford did not put down $11,000 cash at closing. (3:12-cr-239, Doc. No. 573 at 159). She also did not know that Petitioner got $43,000 through Abele Unlimited from the sale, or that Mustapha, through AKKO Ventures, was also getting money. (3:12-cr-239, Doc. No. 573 at 161). Petitioner handled the paperwork to get Ford the loan through SunTrust. (3:12-cr-239, Doc. No. 573 at 161). The loan documents accurately reflect her employer but inflated her income. (3:12-cr-239, Doc. No. 573 at 161).

Ford purchased another home because Petitioner told her it would be a great asset. (3:12-cr-239, Doc. No. 573 at 162-63). It is not true that Ford brought over $2,000 to the closing as the closing documents indicate. (3:12-cr-239, Doc. No. 573 at 164). The down payment check ostensibly from "Jina" Ford was made to Sierra Mortgage. (3:12-cr-239, Doc. No. 573 at 164-65). The check says Petitioner's name for $2,142.47, which is the same cash that Ford supposedly brought to buy the house. (3:12-cr-239, Doc. No. 573 at 165).

Real estate lawyer Christine Gates testified that she was involved in multiple conspiracies including mortgage fraud and money laundering with individuals including Petitioner, Nazeere Saddig, William Brown, Ralph Johnson, and Nathan Wolf. (3:12-cr-239, Doc. No. 574 at 4). She

pled guilty and was testifying pursuant to a subpoena and plea agreement that required cooperation. (3:12-cr-239, Doc. No. 574 at 5). She hoped to get some credit for her assistance down the road but was not promised anything. (3:12-cr-239, Doc. No. 574 at 5).

Gates knew Wolf and Petitioner through closings conducted in Gates' office. (3:12-cr-239, Doc. No. 574 at 6). Gates described her role in fraudulent closing including lies about where money came from and where disbursements, *i.e.,* kickbacks went. (3:12-cr-239, Doc. No. 574 at 8). Gates denied receiving any kickbacks herself. Rather, she turned a blind eye to what was going on to keep business coming in. (3:12-cr-239, Doc. No. 574 at 9-10). She knew about compensation agreements in these cases but did not tell the banks because, if they knew, they would not do the loans. (3:12-cr-239, Doc. No. 574 at 15). She described the notion that it would be legal for buyers to get money back as long as they used a company name instead of their own name on the HUD-1 as "absurd." (3:12-cr-239, Doc. No. 574 at 16). Petitioner worked at Liberty Grace, d/b/a Sierra Mortgage, along with Chris Ogbonna. (3:12-cr-239, Doc. No. 574 at 18). She identified a check from Liberty Grace d/b/a/ Sierra Mortgage to Petitioner for $2,528 that states in the memo line "Gina Ford." (3:12-cr-239, Doc. No. 574 at 19). She also testified that, in Petitioner's purchase of 4332 Howie Circle, for which Gates did the closing, Petitioner signed as borrower on April 28, 2006. (3:12-cr-239, Doc. No. 574 at 22). Petitioner's monthly income was stated as $3,166 on the application date on May 19, 2006, which Petitioner signed. (3:12-cr-239, Doc. No. 574 at 23). These two loans a month apart show two different employers and two different monthly incomes more than $10k different. (3:12-cr-239, Doc. No. 574 at 23-24).

Ford was the closing attorney for one of the Damali Neal transactions. The down payment was provided by Nazeere Saddig's company Winaz, LLC, which agreed to pay down payment in exchange for a larger amount being paid back, $95,000, as part of a seller

participation agreement. (3:12-cr-239, Doc. No. 574 at 25, 27). This was an unusual transaction because Brown signed for Neal and the documents were subsequently returned to Ford's office with notarized signatures. Ford had concerns regarding whether Neal ever signed the documents and met with Ralph Johnson and William Brown. Johnson and Brown said that Neal did not sign the documents, but rather, they were signed by Petitioner. (3:12-cr-239, Doc. No. 574 at 31). When Ford confronted Petitioner, she first said that Neal did sign them, then she eventually said that they were already signed when presented to her and she just notarized them. (3:12-cr-239, Doc. No. 574 at 32). Ford told Petitioner that the bank would want to get in touch with her. Petitioner "indicated that she was going to sign the affidavit that Damali Neal did appear with an identification and that it was – if it was somebody else that had her ID, she was going to say that – that that would be her excuse." (3:12-cr-239, Doc. No. 574 at 33).

With regards to another transaction involving Nazeere Saddig, Petitioner asked to have a portion of the property paid off with the proceeds and transferred to Petitioner, rather than having the whole parcel transferred to Saddig, which would leave him with less than he thought he would get in the transaction. Petitioner said that Saddig did not know she was trying to do this. Ford was very uncomfortable with this request but the situation resolved itself because it turned out that a home straddled the two parcels of land. (3:12-cr-239, Doc. No. 574 at 35). Petitioner instructed Ford to wire $250,000 to Saddig's company in that transaction. (3:12-cr-239, Doc. No. 574 at 36). The HUD-1 statement says the Winaz LLC money was seller concessions, then upgrade repairs to Abele Unlimited. (3:12-cr-239, Doc. No. 574 at 36). However, there was no work done by Winaz or Abele to Ford's knowledge. (3:12-cr-239, Doc. No. 574 at 36). These payments were actually kickbacks. (3:12-cr-239, Doc. No. 574 at 37).

Billy Rodgers, financial crimes investigator for the North Carolina Commissioner of Banks investigated Sierra Mortgage, Liberty Grace Mortgage, with regards to the Neal transaction. (3:12-cr-239, Doc. No. 574 at 85). He interviewed Petitioner with regards to the claimed work that Abele Unlimited performed for $100,000. (3:12-cr-239, Doc. No. 574 at 85). Petitioner "stated that the payment was, in fact, not used for the intended purposes on this document and that the payments were used to keep her business afloat and to make repairs on a different property other than the one used on this document." (3:12-cr-239, Doc. No. 574 at 86). When asked why Petitioner had received the $100,000, Petitioner "stated … that she was receiving funds from Mr. Ogbonna for transfer – for referring customers to him for the purchase of properties." (3:12-cr-239, Doc. No. 574 at 86). Based on what Petitioner said, the money was not used in a way that was consistent with what she represented to the bank, and the HUD statement is not true and accurate. (3:12-cr-239, Doc. No. 574 at 86).

Counsel moved for Rule 29 judgment of acquittal at the close of the Government's case, arguing that the Government had failed to prove criminal intent on the RICO conspiracy, specifically, that there was no testimony that she agreed or conspired to do anything or notarized anything with criminal intent. (3:12-cr-239, Doc. No. 574 at 96). The only testimony was from Ralph Johnson who "said that he tricked [Petitioner] and she did not know what was going on." (Id. at 97). With regards to the bank fraud, counsel "concede[d] that there has been some information" so it is possible that the jury could come back with possibly one federally insured agency. (Id. at 96). The Court denied the motion.

Petitioner chose not to testify or present any evidence. (3:12-cr-239, Doc. No. 575 at 3).

Wolf chose to testify on his own behalf. He explained that he did not engage in contract kiting and thought that the compensation agreements were drafted by attorney Dale Fussell, who

assured Petitioner they were legal. (3:12-cr-239, Doc. No. 575 at 8-9). Wolf though that individuals and the companies they owned were two separate entities pursuant to Fussell's advice, that the RESPA only applies to commercial investor purchases of real estate, and that the only kickback referred to is related to the borrower's down payment. (3:12-cr-239, Doc. No. 575 at 11). He also thought that the compensation agreements were making their way to the lenders because he gave a copy to the buyer, seller, loan officer, and attorney. (3:12-cr-239, Doc. No. 575 at 12-13). He denied agreeing with other people to defraud banks or conspiring with anyone who has been named in this case. (3:12-cr-239, Doc. No. 575 at 14). With regards to inflated sale prices, he testified that he increased listing price based on comparable sales. (3:12-cr-239, Doc. No. 575 at 18). He explained that design service fees are due to incomplete or additional work needed on houses and not kickbacks. (3:12-cr-239, Doc. No. 575 at 20).

With regards to Petitioner's purchase of 1044 Antioch Woods Dr., he claimed that he did not know Petitioner before this transaction and that Wolf was representing Wittig and his wife. Petitioner had her own real estate agent. (3:12-cr-239, Doc. No. 575 at 37). Petitioner provided the names of Mario Dyson, and New Vision Inc, and their design fees of $10,000 and $79,000, respectively. (3:12-cr-239, Doc. No. 575 at 37). The offer document for the Antioch Woods property looks to be signed by Petitioner and Wittig. The compensation agreement for Antioch Woods includes a gross price and strike price that came from an agreement between the buyer and seller. The design fees and allowances are the same as on the HUD-1. Wolf alleges that he did design work and supplied hardware and plumbing supplies for clients through his company, Nate Wolf LLC. (3:12-cr-239, Doc. No. 575 at 62). He claims that he made a personal loan to William Brown for $10,000, that was reimbursed. (3:12-cr-239, Doc. No. 575 at 69). Wolf testified that he never reached an agreement with anyone, including Petitioner, to commit fraud.

(3:12-cr-239, Doc. No. 575 at 96). He thought he was operating legally and properly and never intended to cheat anyone out of money. (3:12-cr-239, Doc. No. 575 at 97). On cross-examination, Wolf testified that he never had any business relationship with Abele or any contract with them. (3:12-cr-239, Doc. No. 575 at 139).

The Government called a rebuttal witness, attorney Dale Fussell, who denied that he drafted a "compensation agreement" for Wolf, advised Wolf on how to structure transactions so that money could go back to companies, or came up with "construction design services" in the contracts. (3:12-cr-239, Doc. No. 575 at 146-48).

The jury found Petitioner guilty of both counts. (3:12-cr-239, Doc. No. 397). The Court sentenced her to 51 months' imprisonment on each count, concurrent, followed by three years of supervised release. (3:12-cr-239, Doc. No. 887).

On direct appeal, Petitioner challenged the Court's denials of her motion in limine as to late discovery and her motion to dismiss for lack of subject-matter jurisdiction. The Fourth Circuit affirmed on January 6, 2016, finding that the Court properly denied the motion in limine and that no plain error occurred with regards to an alleged discovery violation, stating that "the challenged evidence revealed Myles' fraudulent notarization of multiple signature, and the jury reasonably concluded that, in light of the evidence against Myles, she intended to defraud with the purpose of furthering the conspiracy." United States v. Myles, 636 Fed. Appx. 145, 146 (4th Cir. 2016). The Fourth Circuit also denied her claim that the Court erred by denying her motion to dismiss for lack of subject-matter jurisdiction, concluding that, "to the extent that Myles challenges the sufficiency of the evidence supporting her bank-fraud conviction, we conclude such a claim is meritless. Myles' stipulation admitted the facts constituting the insurance element

of bank fraud, and the Government presented evidence at trial establishing the insurance status of banks identified as lenders in the fraud charge of which the jury convicted her." Id. at 147.

Plaintiff filed the instant § 2255 petition through counsel on February 10, 2017. She argues that (renumbered): (1) trial counsel was ineffective for: (a) failing to dismiss Count (1) of the superseding indictment; (b) causing a complete breakdown of the attorney-client relationship; (c) failing to request an "informant" cautionary instruction; and (2) appellate counsel was ineffective for failing to argue on direct appeal that: (a) the expert notary's improperly testified about legal conclusions and statements of law; and (b) the evidence was insufficient to support the convictions.

## II.    SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."

Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The

Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable

competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v.

Gentry, 540 U.S. 1, 8 (2003). The prejudice prong inquires into whether counsel's deficiency

affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a

court cannot grant relief solely because the outcome would have been different absent counsel's

deficient performance, but rather, it "can only grant relief under . . . Strickland if the 'result of

the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882

(4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these

circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v.

Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a

reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670.

Strickland also applies in the context of appellate representation. To show prejudice in

such cases, a petitioner must show a "reasonable probability ... he would have prevailed on his

appeal" but for his counsel's unreasonable failure to raise an issue. Smith v. Robbins, 528 U.S.

259, 285–86 (2000); see also United States v. Mannino, 212 F.3d 835, 845–46 (3d Cir. 2000)

("The test for prejudice under Strickland is not whether petitioners would likely prevail upon

remand, but whether we would have likely reversed and ordered a remand had the issue been

raised on direct appeal.").

15

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### III.    DISCUSSION

**(1)    Ineffective Assistance of Trial Counsel**

Petitioner contends that trial counsel was ineffective for: (a) failing to dismiss Count (1) of the superseding indictment; (b) causing a complete breakdown of the attorney-client relationship; and (c) failing to request an "informant" cautionary instruction.

#### (a)  Motion to Dismiss

Petitioner argues that counsel should have moved to dismiss Count (1) of the superseding indictment which charges RICO conspiracy. He contends that "the enterprise" included individuals as well as entities listed in ¶¶ 79-121, which are all mentioned in connection with activity that is part of a pattern of racketeering activity, so the enterprise had no independent existence apart from the members' performance of the pattern of racketeering acts. To establish an enterprise, the Government had to prove association in fact existed as an entity separate and apart from the pattern of activity in which it engaged. Here, the members and organizational entities that comprised the RICO enterprise existed solely for the alleged purpose of executing the underlying RICO predicate offenses, so the enterprise would cease to exist if the predicates were removed from the equation. The enterprise was merely an assortment of diverse and distinct racketeering acts such as bank fraud and others charged in the superseding indictment.

Therefore, he argues, the Government failed to adequately plead a RICO conspiracy under 1962(d) and count (1) must be dismissed.

For an indictment to be valid, it must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 763 (1962) (internal quotations omitted); see Fed. R. Crim. P. 7(c)(1) (an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged…."). "An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute." Russell, 369 U.S. at 765 (internal quotations and citations omitted). Furthermore, if the indictment tracks the language of the statute, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." Id. at 765; see also Hamling v. United States, 418 U.S. 87, 117-18 (1974). When the indictment uses generic terms, it must state the offense with particularity. Russell, 369 U.S. at 765; United States v. Palin, 874 F.3d 418 (4th Cir. 2017). Additionally, an indictment must enable the defendant to enter a plea that will bar any "future prosecutions for the same offense." Hamling, 418 U.S. at 117; see United States v. Blankenship, 846 F.3d 663 (4th Cir. 2017). However, an indictment need not set forth with detail the government's evidence or set forth every possible legal and factual theory of defendant's guilt. United States v. Am. Waste Fibers Co., 809 F.2d 1044, 1047 (4th Cir. 1987). "[W]here an indictment sets forth the offense elements and includes a brief statement of the facts and circumstances of the offense, but omits certain essential specifics of the offense, dismissal is unwarranted; instead, such an omission, if necessary, is typically and

appropriately remedied by discovery or, in some instances, by requiring the government to file a bill of particulars." United States v. Cuong Gia Le, 310 F.Supp.2d 763, 773-74 (E.D. Va. 2004).

A RICO charge must allege the existence of both an enterprise and a pattern of racketeering activity. Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 14 (2d Cir. 1989). The elements of a substantive RICO offense under § 1962(c) are "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." Salinas v. United States, 522 U.S. 52, 62 (1997). A defendant can conspire to violate RICO and violate § 1962(d) without himself committing or agreeing to commit two or more acts of racketeering activity; simply agreeing to advance a RICO undertaking is sufficient. Salinas, 522 U.S. at 65; United States v. Mouzone, 687 F.3d 207, 219 (4th Cir. 2012). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity…." 18 U.S.C. § 1961(4).

The Superseding Indictment adequately charged RICO conspiracy in violation of §§ 1962(c) and (d). The grand jury charged in ¶ 1 of the Superseding Indictment that, at the specified and relevant times, the defendants and others were members and associates of the Enterprise, "a criminal organization whose members and associates engaged in investment and securities fraud, bank and mortgage fraud, wire fraud, and the distribution of illegal drugs…." (3:12-cr-239, Doc. No. 158 at 5). The Enterprise included its leadership, members, and associates including corporations and entities listed in ¶¶ 79 through 171, as defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact. (Id.). The Enterprise "constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise." (Id.). Count (1)

realleged the allegations contained in ¶¶ 1 through 372 of the superseding indictment and further

charged that:

> From in or about 2005 through in or about 2012, in Mecklenburg and
> Union Counties, within the Western District of North Carolina and elsewhere, the
> defendants … being persons associated with or employed by the Enterprise,
> which engaged in, and which activities of which affected interstate commerce,
> knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to
> conduct and participate, directly or indirectly, in the conduct of the affairs of that
> Enterprise, through a pattern of racketeering activity, as that term is defined by 18
> U.S.C. § 1961(1) and (5), involving multiple acts indictable or chargeable under:
>
> a.      Title 15, United States Code, Section 78j(b) and 78ff, and Title 17, Code
> of Federal Regulations, Section 24.10b-5 (securities fraud);
>
> b.      Title 18, United States Code, Section 1344 (bank fraud);
>
> c.      Title 18, United States Code, Section 1343 (wire fraud);
>
> d.      Title 18, United States Code, Sections 841 and 846 (possession with intent
> to distribute illegal drugs).
>
> … It was part of the conspiracy that the defendants agreed that the conspirator
> would commit at least two acts of racketeering activity in the conduct of the
> affairs of the Enterprise.

(3:12-cr-239, Doc. No. 158 at 79-80).

The indictment tracks the statutory language, addresses all of the elements of the offense,

and describes the alleged enterprise. It is therefore sufficient to charge the offense. See, e.g.,

United States v. Nabors, 45 F.3d 238 (8th Cir. 1995) (although the language of the racketeering

count tracked the statute almost exactly, defendants alleged that the indictment was insufficient

for failing to allege a single continuous RICO enterprise with an existence of its own; district

court's dismissal of the RICO count was reversed because the government was not required to

prove before trial that the enterprise was distinct from the alleged pattern of racketeering

activity). Counsel did not perform deficiently by failing to move to dismiss Count (1) under these

circumstances. Moreover, Petitioner cannot demonstrate prejudice because any deficiency could

have been addressed through a statement of particulars or superseding indictment; there is no reasonable probability that Count (1) would have been dismissed even if counsel had filed a motion to dismiss.

For the foregoing reasons, Petitioner's claim that counsel was ineffective for failing to move to dismiss the RICO conspiracy count is denied.

### (b) *Per Se* Ineffective Assistance

Petitioner contends that counsel caused a complete breakdown of the attorney-client relationship that resulted in *per se* ineffective assistance of counsel. She alleges that counsel abandoned his role as an advocate by failing to: (i) present favorable evidence at trial; (ii) adequately prepare for trial by reviewing discovery and discussing trial strategy with Petitioner; and (iii) adequately communicate with Petitioner about entering a plea.

As a preliminary matter, the Court disagrees with Petitioner's general assertion that the *per se* ineffective standard applies to these claims of ineffective assistance of counsel. There is a narrow exception to Strickland's prejudice prong where a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial." Bell v. Cone, 535 U.S. 685, 695 (2002). This exception applies when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658 (1984). Cronic applies "when ... the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-660. One circumstance warranting the presumption is the "complete denial of counsel," where "counsel [is] either totally absent, or

prevented from assisting the accused during a critical stage of the proceeding." Wright v. Van Patten, 552 U.S. 120, 124-25 (2008) (quoting Cronic, 466 U.S. at 659).

Petitioner's allegations that counsel failed to adequately prepare for trial and present the defense case are garden variety claims of ineffective assistance to which the Strickland standard applies and Petitioner's citation to Cronic is inapposite. Petitioner is obligated to demonstrate that counsel's alleged deficient performance prejudiced her and has failed to do so for each of the sub-claims, each of which will be addressed below.

**(i)    Defense Testimony**

Petitioner contends that counsel failed to call her at trial to explain her version of events before the jury and did not call any representatives of the allegedly defrauded banks to elicit their positions on whether fraud occurred. Although Wolf testified and called Dale Fussell,[3] Petitioner's counsel only questioned Wolf for one page of the trial transcript and did not question Fussell at all. Plaintiff also asked counsel to call Jimario Dyson at trial, from whom Petitioner purchased 1044 Antioch Woods. Dyson's testimony would have refuted Mark Wittig's testimony that he conspired with Petitioners and others and that Petitioner got a kickback on the Antioch Woods property. Petitioner had never spoken to Whittig and had no idea that Nathan Wolf was the property's listing agent; Dyson marketed the property by showing it and negotiating a price. The Antioch Woods Dr. property was the only evidence connecting Petitioner to Wolf and Witting, however, counsel did not call Dyson to testify. Petitioner provided counsel with communications between herself and the buyer of Westmoreland Farms in 2008, and explained that that Abele Unlimited, Inc., had a legal contract with the seller that was fully disclosed and Petitioner believed that this could have served as a viable defense. (Doc. No. 1-2 at 2).

---

[3] The Government actually called Fussell as a rebuttal witness. (3:12-cv-239, Doc. No. 575 at 144).

Attorneys have wide latitude in determining which witnesses to call as part of their trial strategy. See generally Pruett v. Thompson, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993) (decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce."). "[W]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and is one that [the court] will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate and present such a defense is not prejudicial. See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996).

This claim is waived insofar as Petitioner was informed of her right to testify and call defense witnesses in open court and stood silent when counsel rested without calling her or any other witnesses to testify at trial. After the Government rested, the following transpired:

> THE COURT: I'm advised by Mr. Shella that Ms. Myles is not going to put on any testimony and any evidence; is that correct?
>
> MR. SHELLA: That's correct, Your Honor.
>
> THE COURT: All right. Ms. Myles, you know you too have the right to testify on your own behalf if you choose to do so and you have the right not to testify and rely on the presumption of innocence and the argument that the government has failed to prove its case beyond a reasonable doubt. Do you understand all that?
>
> DEFENDANT MYLES: I do, sir.

(3:12-cv-239, Doc. No. 574 at 99).

The following morning before the jury had entered the courtroom, the Court asked whether the defense still intended not to put on any evidence in Petitioner's presence. Counsel stated "[t]hat is correct" and rested before the jury, all of which occurred in Petitioner's presence. (3:12-cv-239, Doc. No. 575 at 3).

Even if Petitioner had not waived this claim, it would be denied on the merits. Petitioner contends that she could have shed light on, and undermined, much of the Government's proof, and specifically alleges that she would have testified that Abele Unlimited had a legal contract with a seller. Any such testimony would have been cumulative of Gates' testimony to that effect and would have exposed Petitioner to cross-examination. (3:12-cr-239, Doc. No. 574 at 40). Petitioner's contentions that she did not conspire with Wittig and had never met him were contradicted by the testimony of several witnesses that they conspired with Petitioner to engage in bank fraud, as well as documentary evidence including her compensation agreement with Wolf and a real estate contract that she and Wittig both signed. Her contention that counsel should have called "bank representatives" and Dyson is insufficient insofar as she has failed to allege that these witnesses were available to testify and would have provided testimony with a reasonable probability of changing the trial outcome. Whether or bank representative thought fraud had occurred is too vague to support relief and is meritless insofar as the banks' opinions about whether fraud occurred is not an element of the offense and has no bearing on the jury's determination of guilt. Moreover, even if Dyson had testified that he was involved in the Antioch Woods transaction, there is no reasonable probability that it would have changed the trial outcome in light of the other evidence of Petitioner's guilt including the testimony of her best friend, Ford, that she bought two properties at Petitioner's urging with false information, and Petitioner's own inculpatory statements to Gates and Investigator Rodgers. See generally United States v. Dyess, 730 F.3d 354, 364-65 (4th Cir. 2013) (rejecting § 2255 petitioner's ineffective assistance claim where he offered nothing more than speculative conclusions in explaining who counsel should have called and what aid their testimony would have provided to his case).

Petitioner's conclusory and speculative allegations have failed to demonstrate that either she, or any other witness, was willing and available to testify at trial, and would have provided testimony had a reasonable probability of resulting in a different trial outcome. For all the foregoing reasons, this claim is denied.

**(ii)     Trial Preparation**

Petitioner contends that counsel never discussed a defense strategy with her and refused to let her review discovery material. Knowledge of the case would have assisted counsel in developing a trial strategy. Petitioner sent counsel cases that she believed to be relevant and asked to see discovery but counsel provided her with "no insight on trial preparations" and said he could not send her discovery because it was "too voluminous." (Doc. No. 1-2 at 1).

To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate such a defense is not prejudicial. See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996).

Petitioner's claim that counsel did not allow her to review discovery is refuted by the record. Petitioner filed a *pro se* motion between the trial and sentencing in which she alleged that counsel had performed ineffectively at trial. This prompted counsel to move to withdraw from the representation. The matter was heard by Magistrate Judge Keesler. (3:12-cv-239, Doc. No. 650). When Petitioner complained at the hearing that counsel had failed to review electronic discovery with her, counsel explained that he reviewed all the relevant discovery with her before trial, and that physically reviewing 800,000 pieces of discovery was infeasible:

> [by Mr. Shella]: … [A]s to the discovery, she's saying I didn't show her
> electronic discovery. There were three voluminous notebooks which the

government – which is every exhibit they had at trial. I sat in here – in this courthouse in the room right outside the courtroom right over there and went through those with her, sat with her three days straight, hours at a time going through every page sitting there with her. I would be at my computer going over stuff and I would then come over and talk to her, review any questions that she had. She was present and her sister was present when this occurred.

Now, did I get on the computer and show it on the screen? No. I went through – there were things that I did print out to show her. But I went through every exhibit that they had. And I also spoke to her about the discovery. It's 800,000 pages. It's just simply not possible for me to sit with her to go and let her see 800,000 pages. Everything that they planned to put in at trial, everything they put in at trial, I showed her. Everything. Everything was in those notebooks.

(3:12-cr-239, Doc. No. 650 at 15).

A contemporaneous email between Petitioner and counsel confirms that the two had reviewed and discussed discovery during trial preparation. See (3:12-cr-239, Doc. No. 455 at 10). Petitioner's present self-serving claim that counsel failed to review discovery with her is refuted by the record and is therefore rejected.

Further, Petitioner has failed to demonstrate prejudice by explaining how additional review of discovery and discussion with counsel would have probably resulted in a different trial outcome. See Dyess, 730 F.3d at 364-65 (rejecting § 2255 petitioner's ineffective assistance claim where he offered nothing more than speculative conclusions in explaining who counsel should have called and what aid their testimony would have provided to his case). This claim will be denied.

**(iii)** **Plea Negotiations**

Petitioner contends that counsel informed her of two plea deals offered by the Government, but physical copies of the plea deals were never given to her. The first plea offer was when counsel whispered to her at the initial appearance that "they are offering a plea of 5 years" and Petitioner said "no." (Doc. No. 1-2 at 2). Counsel did not discuss the second offer

with her in detail. Counsel did not explain its terms but advised that Petitioner "should take the plea" because he thought it would be hard for her to win at trial in rural North Carolina, which Petitioner did not deem a sufficient reason to take a plea. (Doc. No. 1-2 at 2). Counsel advised her to think about it for a few days and said she would only get a copy of the plea agreement if she was going to sign it. Based on this, Petitioner "opted not to take the plea deal and to proceed to trial." (Doc. No. 1-2 at 3). Counsel failed to inform Petitioner of the elements of the offenses and Government's proof requirements with regards to the RICO charge. Had counsel done so "it is possible that [Petitioner] would have made a different decision regarding going to trial." (Doc. No. 1 at 1-2 at 3). Petitioner contends that counsel failed to advise Petitioner of the advantages and disadvantages of pleading and did not provide her with adequate knowledge of the case – including the fact that uncorroborated testimony of a cooperating co-conspirator may be sufficient to convict – would have been essential to her decision whether to plead guilty. Petitioner asserts that, if she had known this, there is a reasonable probability she would not have gone to trial.

The Sixth Amendment right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process. See Missouri v. Frye, 566 U.S. 134 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during that process. Lafler v. Cooper, 566 U.S. 156, 162 (2012) (internal quotation marks omitted); Merzbacher v. Shearin, 706 F.3d 356, 363 (4th Cir. 2013). As a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Frye, 566 U.S. at 145. To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they

would have accepted the earlier plea offer had they been afforded effective assistance of counsel, as well as a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. Id. at 147. It is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. Id.

The record reveals that counsel did inform Petitioner of two plea offers and encouraged her to plead guilty. Petitioner admits that counsel presented her with two plea agreements but that she rejected them over counsel's advice. She alleges that it is "possible" that her decision might have been different had counsel advised her differently. (Doc. No. 1 at 1-2 at 3). This self-serving and speculative claim is insufficient to establish deficient performance. Nor has Petitioner established a reasonable probability that she would have accepted one of the plea offers, or that the offers would have resulted in a lesser charge or lower sentence. Therefore, this claim will be denied.

### (c) "Informant" Cautionary Instruction

Petitioner contends that counsel was ineffective for failing to request an "informant" cautionary instruction.

When reviewing trial counsel's failure to request a jury instruction, the inquiry is twofold: (1) whether the instruction, if requested, should have been given; and (2) if the instruction had been given, was there a reasonable probability that the outcome of the proceedings would have been different." Hope v. Cartledge, 857 F.3d 518, 523 (4th Cir. 2017).

Petitioner's claim is refuted by the record because an informant instruction was requested, but the Court refused to give that instruction because no paid informant testified at trial. The Government called numerous witnesses "who have signed plea agreements, pled guilty

to felonies, or people who weren't even prosecuted because they're a witness even though they were subject to being charged." (3:12-cv-239, Doc. No. 571 at 16). During the charge conference, the Court addressed a proposed instruction regarding "testimony of an informant, credibility," then stated "[t]here is no informant testimony here, is there?" and the prosecutor responded "[n]o, sir." (3:12-cv-239, Doc. No. 575 at 160); see (3:12-cv-239, Doc. No. 381) (Co-defendant Wolf proposed a jury instruction included "ACCOMPLICE – INFORMER – IMMUNITY").[4] Therefore, Petitioner's contention that no "informant" instruction was requested is incorrect. Petitioner's reliance on United States v. Luck, 611 F.3d 183 (4th Cir. 2010), is misplaced because it is factually distinguishable from the instant case where no paid informant testified at trial. The Court correctly denied the informant instruction because it is factually inapplicable to Petitioner's case. The Court correctly provided instructions on considering the credibility of witnesses, (3:12-cr-239, Doc. No. 576 at 113), and cooperating accomplices, (3:12-cr-239, Doc. No. 576 at 119).

An "informant" jury instruction was requested and correctly rejected, and the Court provided factually applicable and legally sound instructions regarding the jury's consideration of witness credibility. Therefore, this claim is denied.

### (2)     Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for failing to argue on direct appeal that: (a) expert witnesses improperly testified about legal conclusions and statements of law; and (b) the evidence was insufficient to support the convictions. Petitioner argues that there is a reasonable probability that, if counsel argued on appeal that experts cannot make conclusions

---

[4] No proposed jury instructions filed by Petitioner are included in the record.

and statements of law, the result of the appeal would be different because Fourth Circuit would have vacated the conviction and remanded for a new trial.

**(a) <u>Expert Witnesses</u>**

Petitioner contends that appellate counsel was ineffective for failing to argue on direct appeal that the Government's expert witnesses improperly testified to legal conclusions and opinions.

"[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." <u>United States v. McIver</u>, 470 F.3d 550, 562 (4th Cir. 2006). However, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Ev. 704(a). The advisory committee note for Rule 704 states that "[t]he basic approach to opinions, lay and expert, in these rules is to admit them when they are helpful to the trier of fact…." Fed. R. Ev. 704, advisory committee note (1972).

Plaintiff argues that Debra Sherrill, an expert witness on mortgage banking, improperly testified regarding conclusions of law as follows:

> Q. [by the prosecutor] … Now is the borrower required to sign [the loan application]?
>
> A. [by Ms. Sherrill]  It would have to be signed ultimately. It may not be signed initially at application, but yes, the borrow would definitely have to sign it at closing.
>
> Q. Why?
>
> A. When the borrower signs this document, the borrower is agreeing that every page of this application is true and correct.
>
> Q. Why does that matter?
>
> A. Because otherwise there could be fraud.

(3:12-cr-239, Doc. No. 571 at 48).

Q. [by the prosecutor] … Dr. Sherrill, what is this document?

A. [by Ms. Sherrill] This is formally called the HUD-1 Settlement Statement, but it's normally just referred to as the HUD-1.

Q. … What is this document for?

A. This is a document that is required by federal law to list every single fee connected to this transaction on the buyer's and the seller's end.

Q. Why?

A. Federal law says so.

MR. FOSTER: Objection to legal opinions.

THE WITNESS: No. that is the RESPA.

MR. FOSTER: Objection.

THE COURT: Overruled.

(3:12-cr-239, Doc. No. 571 at 50)

A. [by Ms. Sherrill] The HUD-1 requires every single, solitary fee connected to that transaction must be on the HUD-1. If it is six months ago, it's an expense, it's on there. If it was paid in advance, it's on there. It's required by federal law.

(3:12-cr-239, Doc. No. 571 at 84)

Q. [by co-defendant's counsel Mr. Foster] You earlier said that every single piece of information on the loan application is important.

A. [by Ms.] In some capacity, yes.

Q. And I think you went as far as to say it would be fraud if anything was not correct on there.

A. If it is an intentional misstatement, misrepresentation or omission, it would be considered fraud.

Q. By you.

A. No, by federal law.

MR. FOSTER: Well, I move to strike that, Your Honor.

THE COURT: Sustained. Ignore her opinion on federal law.

(3:12-cr-239, Doc. No. 571 at 85)

Ozie Stallworth testified as an expert witness on North Carolina notary publics and their duties. (3:12-cr-239, Doc. No. 573 at 34). Petitioner contends that counsel failed to object when Stallworth offered conclusions of law on several occasions but that the "entire series of events" nevertheless should have been presented on direct appeal. (Doc. No. 1-1 at 16).

As a preliminary matter, this claim is denied as to Stallworth because Petitioner fails to identify the specific portions of testimony that appellate counsel should have raised on appeal. See generally Dyess, 730 F.3d at 364-65 (rejecting § 2255 petitioner's ineffective assistance claim where he offered nothing more than speculative conclusions in explaining who counsel should have called and what aid their testimony would have provided to his case).

Sherrill's testimony about the requirements of federal law, and Stallworth's testimony about the requirements of North Carolina law, were unobjectionable because the information they imparted was subject to judicial notice. See generally Bellaire, Benwood & Wheeling Ferry Co. v. Interstate Bridge Co., 40 F.2d 323, 326 (1930) ("The courts will take judicial notice of the laws of the United States…."); Junction R. Co. v. Bank of Ashland, 79 U.S. 226, 227 (1870) ("The courts of the United States will take judicial notice of the public laws of the several States…."). The experts' opinions also aided the jury in understanding the mortgage and notary processes and were thus admissible under Rule 704. The gist of Stallworth's testimony was not objectionable because it explained the three different types of notarization under North Carolina's notary rules, the requirements of each, and what the rules require if the person signing is not before the notary. Shilling's testimony similarly explained the requirements for obtaining a mortgage and the required paperwork that is involved in the loan process. This testimony did not

draw legal conclusions about Petitioner's guilt, but rather, explained federal mortgage documentation and North Carolina notarization standards to the jury so that the jury could decide whether Petitioner violated RICO conspiracy and mortgage fraud statutes. See generally Daugherty v. Ocwen Loan Serv., LLC, 701 Fed. Appx. 246 (4th Cir. 2017) (expert's testimony about the reasonableness of Ocwen's conduct in light of the FCRA regulatory framework was admissible because it did not draw legal conclusions, but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient). Shilling's single comment about her opinion regarding federal law was objected to, the objection was sustained, and the Court gave a curative instruction. See generally United States v. Francisco, 35 F.3d 116, 119-20 (4th Cir. 1994) (the Fourth Circuit generally follows the presumption that the jury obeyed the district court's instructions).

There is no reasonable probability that the Fourth Circuit would have reversed on direct appeal had counsel raised Shilling's and Stallworth's expert witness testimony on direct appeal under these circumstances.

No deficient performance or prejudice has been demonstrated, and accordingly, this claim will be denied.

**(b) Sufficiency of the Evidence**

Petitioner contends that appellate counsel should have argued on direct appeal that the evidence was insufficient to prove all the elements of conspiracy pursuant to § 1962(d) and bank fraud pursuant to § 1344. She argues that many witnesses did not name her at trial and that the Government failed to "connect the dots" of Witttig's testimony with proof necessary to convict her. (Doc. No. 1-1 at 17).

Petitioner's claim that the Fourth Circuit would have found insufficient evidence to support the bank fraud conviction had counsel presented it on direct appeal is conclusively refuted by the record. The Fourth Circuit held that "to the extent that Myles challenges the sufficiency of the evidence supporting her bank-fraud conviction, we conclude that such a claim is meritless." Myles, 636 Fed. Appx. at 147.

Petitioner's claim that the Government failed to prove RICO conspiracy is refuted by the record. As previously stated, the elements of a substantive RICO offense under § 1962(c) are "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." Salinas, 522 U.S. at 62. A defendant can conspire to violate RICO and violate § 1962(d) without himself committing or agreeing to commit two or more acts of racketeering activity; simply agreeing to advance a RICO undertaking is sufficient. Salinas, 522 U.S. at 65; Mouzone, 687 F.3d at 213 (because a RICO conspiracy does not "criminalize mere association with an enterprise," "criminal liability will attach only to the knowing agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute"). To establish a RICO conspiracy, the government need not prove that a pattern of racketeering activity actually occurred. It need only prove that the conspirators intended to further an endeavor that would include a pattern of racketeering activity. United States v. Baker, 598 Fed. Appx. 165, 172 (4th Cir. 2015).

The Government presented evidence at trial that: Petitioner recruited her best friend, Ford, to purchase two properties with falsified loan qualifications, at least one of which financially benefitted Petitioner and her husband through unearned kickbacks; the kickback arrangement was formalized in a compensation agreement drafted by Wolf and signed by Petitioner; Petitioner purchased several properties with false documentation that did not

accurately reflect her employment history or income; Petitioner signed a contract for a property purchase that she signed along with Wittig; Petitioner notarized numerous inaccurate and forged closing documents outside the individual's presence; Petitioner planned to lie to the bank when questioned about one of the false notarizations in one case; and Petitioner recruited Williams into the scheme to see if he knew anyone interested in buying some homes that would result in kickbacks, which came to pass, then Williams cut her out of the operation by dealing with the home builder directly so that he did not have to split the kickback with Petitioner any longer. This provided sufficient evidence for a jury to conclude that Petitioner was actively and knowingly engaged in bank fraud, recruited at least one individual to bring buyers, brought at least one buyer herself, purchased homes to benefit herself and her husband via their companies, and notarized multiple fraudulent documents for the scheme.

There is no reasonable probability that Petitioner's sufficiency of the evidence claim with regards to RICO conspiracy would have succeeded had counsel raised it on direct appeal. See, e.g., United States v. Tillett, 763 F.2d 628, 632 (4th Cir. 1985) (evidence was sufficient to show an organization that functioned as a continuing unit and that existed apart from a pattern of racketeering activity where, for instance, a seafood restaurant was established to serve as a legitimate business front for the smuggling operation, trucks and equipment were purchased and, a corporation was formed); United States v. Irving, 66 Fed. Appx. 480 (4th Cir. 2003) (sufficient evidence showed that an enterprise existed with the common purpose of dealing crack cocaine where that goal was pursued on a daily basis for many years and the enterprise members committed various offenses for the organization); United States v. West, 877 F.2d 281 (4th Cir. 1989) (sufficient evidence that defendant knowingly participated in the organization's activities where there was evidence that defendant was one of the organization's two biggest customers, he

purchased drugs from safehouses two or three times a week, he was seen will a million dollars and multiple kilos in his possession, and he was a major supplier of drugs in his community).

Petitioner has failed to demonstrate either deficient performance or prejudice. Petitioner's claims of ineffective assistance of appellate counsel are, therefore, denied.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Petitioner's § 2255 Motion to Vacate.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED**.

2. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: August 24, 2018

Graham C. Mullen
United States District Judge